IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MAURICE SPORTING GOODS, INC., | ) |
| Plaintiff, | ) ) ) |
| | ) No. 15-cv-11652 |
| v. | ) ) |
| BB HOLDINGS, INC. d/b/a BUCK BOMB, | ) ) |
| Defendant. | ) ) |

# MEMORANDUM OPINION AND ORDER

Plaintiff Maurice Sporting Goods, Inc. ("Maurice") has moved the Court to strike the affirmative defenses of Defendant BB Holdings, Inc., d/b/a Buck Bomb ("Buck Bomb"). (R.33). For the following reasons, the Court grants in part and denies in part Maurice's renewed motion. The Court denies Maurice's motion to strike the First Affirmative Defense. The Court grants the balance of Maurice's motion and dismisses, with prejudice, the Second, Third, and Fourth Affirmative Defenses.

## PROCEDURAL HISTORY

On May 11, 2016, the Court issued a Memorandum Opinion and Order (the "Order") on Maurice's initial motion to strike and dismiss Buck Bomb's affirmative defenses. (R.31). In relevant part, the Order struck without prejudice Buck Bomb's First, Second, Third, Fifth, Sixth, Seventh, and Eighth Affirmative Defenses. On May 25, 2016, Buck Bomb filed a Second Amended Answer, reasserting five affirmative defenses: (1) prior material breach; (2) contribution; (3) unclean hands; (4) equitable estoppel; and (5) statute of frauds.[1] Maurice now

---
[1] The Court denied Maurice's initial motion to strike Buck Bomb's statute of frauds affirmative defense. (R.31, Order at 13-14).

moves to strike Affirmative Defense Nos. 1-4. (R.33). In considering this motion, the Court presumes familiarity with the background of this action—as set forth in the Order—and does not recite it here.

## LEGAL STANDARD

Pursuant to Rule 12(f), the Court can strike "any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed.R.Civ.P. 12(f); *Delta Consulting Grp., Inc. v. R. Randle Constr., Inc.*, 554 F.3d 1133, 1141 (7th Cir. 2009). "Affirmative defenses will be stricken 'only when they are insufficient on the face of the pleadings.'" *Williams v. Jader Fuel Co.*, 944 F.2d 1388, 1400 (7th Cir. 1991) (quoting *Heller Fin. v. Midwhey Powder Co.*, 883 F.2d 1286, 1294 (7th Cir. 1989)). "Motions to strike are not favored and will not be granted unless it appears to a certainty that plaintiffs would succeed despite any state of the facts which could be proved in support of the defense, and are inferable from the pleadings." *Id.* (citations and quotations omitted).

It is appropriate, however, "for the court to strike affirmative defenses that add unnecessary clutter to a case." *Davis v. Elite Mortgage Servs.*, 592 F. Supp. 2d 1052, 1058 (N.D. Ill. 2009) (citing *Heller*, 883 F.2d at 1295). "It is also true that because affirmative defenses are subject to the pleading requirements of the Federal Rules of Civil Procedure, they must set forth a 'short and plain statement' of all the material elements of the defense asserted; bare legal conclusions are not sufficient." *Id.* (citing *Heller*, 883 F.2d at 1294; Fed.R.Civ.P. 8(a); *Renalds v. S.R. G. Rest. Grp.*, 119 F. Supp. 2d 800, 802 (N.D. Ill. 2000)). The Court—along with many others in this District—examines affirmative defenses by reference to *Twombly*'s "plausibility" pleading standard. *See, e.g.*, *State Farm Fire & Cas. Co. v. Electrolux Home Products, Inc.*, No. 10 C 7651, 2011 WL 133014 (N.D. Ill. Jan. 14, 2011) (citing *Bell Atlantic v. Twombly*, 550 U.S.

544, 555 (2007)); *see also Edwards v. Mack Trucks, Inc.*, 310 F.R.D. 382, 386 (N.D. Ill. 2015) ("While the Seventh Circuit has not addressed whether the *Twombly–Iqbal* standard applies to affirmative defenses, judges in this district have generally found these requirements to apply"). District courts have considerable discretion under Rule 12(f). *See Delta*, 554 F.3d at 1141-42.

## ANALYSIS

**I.     Affirmative Defense No. 1 (Material Breach – Excuse)**

Affirmative Defense No. 1 states that Plaintiff cannot recover "because Plaintiff first materially breached the parties' long-standing distribution agreement." (R.32, Affirmative Defense No. 1). In the Order, the Court struck this affirmative defense because Buck Bomb had failed to allege facts (i) plausibly suggesting the existence of a broader "distribution agreement" related to the Buy-Back Agreement at issue in this case, and (ii) giving Maurice fair notice of its material breach allegations. (R.31, Order at 5-7).

In its amended pleading, Buck Bomb alleges that around 2006, Plaintiff offered to distribute Buck Bomb's products to retailers such as Walmart, Kmart, and Blain's. (R.32, Affirmative Defense No. 1, ¶ a). Plaintiff "agreed to use its best efforts to distribute the [p]roducts and to fulfill all sales forecasts issued by retailers" in exchange for "Buck Bomb selling its products to Plaintiff at below-retail rates[.]" (*Id.*). Buck Bomb accepted these terms and began selling its products to Plaintiff for distribution. (*Id.*). This agreement continued for "nearly eight years, with Plaintiff regularly submitting written purchase orders to Buck Bomb to fulfill retailers' sales forecasts." (*Id.*). In 2014, however, Plaintiff materially breached the distribution agreement, "including by failing to pay the full amount due under purchase orders and failing to use its best efforts to fulfill sales forecasts from retailers, including Walmart." (*Id.*, ¶ c). This prior material breach, Buck Bomb reasons, excused its own non-performance under

3

the concluding part of their longstanding distribution agreement – that is, under the 2015 Buy-Back Agreement. (*Id.*, ¶ b). Maurice now challenges the sufficiency of these allegations.

Under Illinois law, "[a] contract, to be valid, must contain offer, acceptance, and consideration; to be enforceable, the agreement must also be sufficiently definite so that its terms are reasonably certain and able to be determined." *Halloran v. Dickerson*, 287 Ill. App. 3d 857, 867–68, 679 N.E.2d 774, 782 (5th Dist. 1997); *see also Nielsen v. United Servs. Auto. Ass'n*, 244 Ill. App. 3d 658, 662, 612 N.E.2d 526, 529 (2d Dist. 1993) (the "essential elements" of a breach of contract action are a "valid and enforceable contract," performance, breach, and resultant injury). Here, Buck Bomb has adequately alleged offer, acceptance by performance, and consideration. Whether the alleged contract is "sufficiently definite," however, is a different issue. *See id.*; *see also Perez v. Abbott Labs.*, No. 94 C 4127, 1995 WL 86716, at *8 (N.D. Ill. Feb. 27, 1995) ("The requirement of definiteness applies with equal or greater force to oral contracts") (examining Illinois law); *Kraftco Corp. v. Kolbus*, 1 Ill. App. 3d 635, 638, 274 N.E.2d 153, 155 (4th Dist. 1971) ("It is basic in the formation of a contract that the parties must have entered into an agreement which is sufficiently definite and certain so that the terms are either determined or may be implied").

A. **Essential Terms**

Maurice first argues that Buck Bomb has failed to plead the contract's "essential terms," including duration, termination terms, geographical reach, retailer details, servicing terms, delivery terms, pricing terms, or performance benchmarks. (R.34, Opening Br. at 5-9; R.38, Reply Br. at 2-10). Buck Bomb, in turn, points to its allegations regarding "purchase orders" and "sales forecasts" as sufficiently definite and certain terms. According to Buck Bomb, "sales forecast" is a term of art in the distribution industry which "identifies the [p]roducts that the

distributor is responsible for supplying and the specific quantity that the retailer expects to be stocked and sold in stores for that year." (R.37, Response Br. at 4-5). After eight years of performance, Buck Bomb alleges, Maurice breached the parties' agreement by "failing to pay the full amount due under purchase orders and failing to use its best efforts to fulfill sales forecasts from retailers, including Walmart." (R.32, Affirmative Defense No. 1, ¶ c).

Maurice's "essential terms" argument draws principally from *Kraftco Corp. v. Kolbus*, 274 N.E.2d 153 (4th Dist. 1971). In *Kraftco*, the court affirmed judgment in favor of the plaintiff and declined to enforce a purported contract based on "utterances of an informal character" concerning a distribution arrangement, which did not "set forth terms . . . [such] as duration, prices, area, products, quotas, etc." *Kraftco*, 274 N.E.2d at 155.[2] Similarly, in *O'Neil and Santa Claus, Ltd. v. Xtra Value Imports, Inc.*, 51 Ill. App. 3d 11, 14, 365 N.E.2d 316, 318-19 (3d Dist. 1977), the court cited to *Kraftco* and held that distributor-plaintiff had failed to establish, by a preponderance of the evidence, "such matters as the duration of the relationship, the area in which the plaintiff was to solicit sales, whether sales quotas were imposed as part of the agreement, the extent of the services plaintiff was to perform, and what the agreed commission rate would be." Other courts cite to *Kraftco* and *O'Neil* in deeming oral distribution agreements unenforceable. *See, e.g.*, *Bensdorf & Johnson, Inc. v. N. Telecom Ltd.*, 58 F. Supp. 2d 874, 878 (N.D. Ill. 1999) (citing *O'Neil*); *Ken-Pin, Inc. v. Vantage Bowling Corp.*, No. 02 C 7991, 2004 WL 783092, at *3 (N.D. Ill. Jan. 20, 2004) (citing *Bensdorf*); *Magid Mfg. Co. v. U.S.D. Corp.*, 654 F. Supp. 325, 333 (N.D. Ill. 1987) (citing *Kraftco*); *Bell Fuels, Inc. v. Chevron U.S.A., Inc.*, No. 99 C 2586, 2000 WL 305955, at *5 (N.D. Ill. Mar. 21, 2000) (citing *Magid*).

---

[2] The *Kraftco* court further deemed the purported contract to be "lacking in mutuality of obligation and unenforceable" insofar as there "was no obligation upon [the distributor] other than to use his best efforts. He had no obligation to sell any specific quantity and no obligation to meet any quotas." *Id.* at 155-56. In so finding, the court reasoned that "[t]he mere allegation of best efforts is too indefinite and uncertain to be an enforceable standard." *Id.*

5

As an initial matter, the Court observes that federal pleading standards apply in this diversity case – not "the more rigorous requirements of Illinois law." *See Skinner v. Shirley of Hollywood, a Div. of Nat. Corset Supply House*, 723 F. Supp. 50, 52 n.1 (N.D. Ill. 1989). As such, while Buck Bomb "must ultimately prove the[] requirements of Illinois substantive law in order to prevail" on its affirmative defense, it "need not allege them explicitly under federal notice pleading." *See Cleland v. Stadt*, 670 F. Supp. 814, 816 (N.D. Ill. 1987) ("As long as the defendants are on sufficient notice of the nature of the claim, the plaintiff has satisfied federal pleadings requirements"). The Court declines, therefore, to read *Kraftco* and *O'Neil* as setting forth the Rule 12(b)(6) pleading requirements for a litigant to recover on a distributorship contract claim in federal court. This level of detail is not necessary to survive a Rule 12(b)(6) challenge, even under *Twombly* and *Iqbal*. *See Twombly*, 550 U.S. at 544; *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

*Kraftco* and *O'Neil*, moreover, each acknowledge that the essential terms of a contract may be implied. *See Kraftco*, 274 N.E.2d at 155 ("Although terms of the contract may be implied in certain circumstances, writing the total contract for the parties is without the purview of the courts"); *O'Neil*, 365 N.E.2d at 319 ("To prove a contract implied in fact the essential terms of the contract must be supplied by implication from the parties' conduct or actions"); *see also Ass'n Ben. Servs., Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 852 (7th Cir. 2007) (recognizing the same under Illinois law). As other courts have observed, "[a]n indefinite contract or a contract provision that appears too vague for enforcement at its inception may be made definite by performance." *Res. Dealer Grp., Inc. v. Executive Servs., Ltd.*, No. 97 C 4343, 1997 WL 790737, at *3 (N.D. Ill. Dec. 18, 1997) (citing *Hammond Grp., Ltd. v. Spalding & Evenflo Cos., Inc.*, 69 F.3d 845, 850 n. 2 (7th Cir. 1995)); *see also Wald v. Chicago Shippers Ass'n*, 175 Ill.

App. 3d 607, 620, 529 N.E.2d 1138, 1147 (1st Dist. 1988) ("A previous course of dealing may give meaning to or qualify an agreement. Part performance of an agreement may also remove uncertainty and establish an enforceable contract"); *Skinner*, 723 F. Supp. at 53 ("In light of the fact that both parties had been fully performing under the contract for eleven years prior to the alleged breach, Shirley's position that the agreement was vague and unclear is disingenuous. Under basic contract law, an agreement that is too indefinite to be enforceable can be made definite by performance").

Given the allegations concerning the parties' course of performance from 2006-2014, including the submission of purchase orders and the fulfillment of sales forecasts issued by named retailers, Maurice is on sufficient notice of the nature of the defense against it. *See Cleland*, 670 F. Supp. at 816; *Bissessur v. Indiana Univ. Bd. of Trustees*, 581 F.3d 599, 603 (7th Cir. 2009) ("Our system operates on a notice pleading standard; *Twombly* and its progeny do not change this fact").

### B. Mutuality and Duration

Affirmative Defense No. 1 likewise does not fail for lack of mutuality at this stage. In particular, Maurice argues that a "'best efforts' clause in a distribution contract of indefinite duration is so vague that it fails to provide any basis to determine when, or if, that party has performed in the first place." (R.38, Reply Br. at 9) (citing *Kraftco*, 1 Ill. App. 3d at 639-40). In *Kraftco*, however, the distributor had "no obligation to sell any specific quantity and no obligation to meet any quotas." *See id.* Here, by contrast, Buck Bomb has alleged that, in a given year—and in exchange for the ability to purchase products below the retail rate—Maurice was under an obligation to use "best efforts" to fulfill a stated metric – that is, sales forecasts issued by retailers. *Cf. Heritage Remediation/Eng'g, Inc. v. Wendnagel*, No. 89 C 413, 1989 WL

7

153373, at *5 (N.D. Ill. Nov. 9, 1989) (applying Illinois law and recognizing that "it is possible to infer from the circumstances the standard of performance required by a 'best efforts' clause where the parties have agreed to work toward a specific goal" in a distribution arrangement) (quoting *Pinnacle Books, Inc. v. Harlequin Enter. Ltd.*, 519 F. Supp. 118, 121–22 (S.D.N.Y.), *aff'd*, 661 F.2d 910 (2d Cir. 1981)). Indeed, "best efforts" agreements are not *per se* unenforceable under Illinois law. *See Clever Ideas, Inc. v. Citicorp Diners Club, Inc.*, No. 02 C 5096, 2003 WL 21982141, at *15-17 (N.D. Ill. Aug. 20, 2003) (collecting cases on that score); *see also Denil v. DeBoer, Inc.*, 650 F.3d 635, 638 (7th Cir. 2011) ("A best-efforts clause usually requires one party to make appropriate investments for another's benefit—for example, a distributor bound to use best efforts to promote a line of products must advertise them, hawk them to retailers, and so on"); *TMG Kreations, LLC v. Seltzer*, 771 F.3d 1006, 1012-13 (7th Cir. 2014) (reading a "best efforts" commitment into an exclusive distributorship contract in the absence of contrary terms).

Buck Bomb's "best efforts" allegations, thus, are sufficient to survive a Rule 12(b)(6) challenge under federal pleading standards. *See Skinner*, 723 F. Supp. at 53 (discussing mutuality at the Rule 12(b)(6) stage); *Resource Dealer*, 1997 WL 790737 at *4 (interpreting a "best efforts" clause and noting that "in general courts tend to decide this issue at the summary judgment stage or later when they can refer to more than just a complaint"); *see also Grant v. Bd. of Educ. of City of Chicago*, 282 Ill. App. 3d 1011, 1024-25, 668 N.E.2d 1188, 1197-98 (1st Dist. 1996) ("the question of whether a party has satisfied its 'best efforts' or good faith obligations is a factual one, dependent upon the nature of the undertaking for which the 'best efforts' commitment has been made") (citing *United States v. Bd. of Educ.*, 799 F.2d 281, 292 (7th Cir. 1986)); *Cohen v. Wood Bros. Steel Stamping Co.*, 175 Ill. App. 3d 511, 515, 529 N.E.2d 1068,

1070 (1st Dist. 1988) ("Further, it is recognized that even contracts which are defective due to a lack of mutuality at inception may be cured by performance in conformance therewith"); *contra Ryan v. Wersi Elecs. GmbH & Co.*, 3 F.3d 174, 181 (7th Cir. 1993) (affirming summary judgment order and noting that "without any sales quota or durational terms, a distributorship agreement lacks mutuality and thus is not enforceable"); *Kay Beer Distrib., Inc. v. Energy Brands, Inc.*, 408 F. App'x 996, 998 (7th Cir. 2011) (affirming summary judgment order concerning an oral distribution contract "that was to last as long as the distributor used its 'best efforts'" where the distributor had failed to produce evidence concerning the "exchanges of promises that could form a contract or delineate its terms").

The lack of an explicit durational term, moreover, does not appear fatal to Buck Bomb's affirmative defense at this time. The "breach" alleged in Affirmative Defense No. 1 is not Maurice's 2015 termination of the distribution agreement. *See Kraftco*, 274 N.E.2d at 156 ("It has long been the holding of the Illinois courts that where an executory contract fixes no time for its operation, it is terminable at the will of either party"). Rather, the defense plausibly suggests a breach after Maurice incurred an obligation to remit payment for fulfilled purchase orders and to satisfy sales forecasts based on discounted Buck Bomb product in its 2014 inventory. *See Bliss & Laughlin Steel Co. v. TRW Koyo Steering Sys., Co.*, No. 91 C 4993, 1995 WL 134773, at *2 (N.D. Ill. Mar. 27, 1995) ("Although the contract here was terminable at will to the extent that TRW had no obligation to order a certain number of became rack blanks or to place orders for a certain period of time, once an order was in . . . Bliss obligated to produce the rack blanks and TRW became obligated to purchase them"). According to Buck Bomb, this prior material breach (i) resulted in more inventory on hand at the time of the 2015 Buy-Back Agreement—which Buck Bomb views as part of the "longstanding distribution agreement"—and (ii) excused Buck

9

Bomb from performing thereunder. Given the nature of the alleged breach—untied to contract termination—the lack of an explicit durational term does not bar Affirmative Defense No. 1 at this time.[3] *See generally Jespersen v. Minnesota Min. & Mfg. Co.*, 183 Ill. 2d 290, 700 N.E.2d 1014 (1998) (explaining the rationale behind enforcing "indefinite duration" contracts as terminable at the will of either party, and finding no breach arising from such termination).

For the stated reasons, the Court, in its discretion, declines to strike Affirmative Defense No. 1. *See Delta*, 554 F.3d at 1141-42. The Court expresses no view on the ultimate viability of this defense, including whether "best efforts" is an enforceable contract term, or whether the alleged contract as a whole is sufficiently definite. The Court cautions, moreover, that "[w]hatever the outer limits of a doctrine of implied essential terms would be under Illinois law, they plainly are exceeded when the parties' conduct does not provide a reasonable basis for implying, with the requisite specificity" the essential terms of a contract. *Caremark*, 493 F.3d at 852.[4] For now, the Court holds that Buck Bomb has satisfied federal pleading standards with respect to Affirmative Defense No. 1.

## II. Affirmative Defense No. 2 (Contribution)

Affirmative Defense No. 2 states that Plaintiff caused or contributed to its own alleged damages. (R.32, Affirmative Defense No. 2). In the Order, the Court struck this affirmative defense for lack of factual support, whether under a contractual theory or a misrepresentation theory. (R.31, Order at 7-10). By amendment, Buck Bomb clarifies that Maurice's own actions

---

[3] The Court does not consider Buck Bomb's additional argument that it "pled both a specific duration [through 2014] and that Maurice failed to fulfill its obligations under the agreement during that duration." (R.43, Sur-Reply at 5). First, Buck Bomb previously admitted to its "indefinite period" allegations. (R.37, Response Br. at 8 ("Admittedly, Buck Bomb alleges that the parties agreed to a longstanding distribution agreement of an indefinite period")). Second, if the alleged distribution agreement ran only through 2014, Buck Bomb fails to explain how it is excused from performing under a seemingly *separate* contract – that is, under the 2015 Buy-Back Agreement.

[4] Ultimately, "[w]hether an indefinite term renders a contract void for lack of mutuality or merely vitiates an individual provision in a contract, the question of indefiniteness is the same question of law: Have the parties so indefinitely expressed their intentions that the court cannot enforce their agreement?" *See Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1440–41 (7th Cir. 1992).

increased the amount of inventory on hand at the time of the Buy-Back Agreement, including its actions in (i) failing to meet product demand throughout the year; (ii) ordering large quantities of product at inopportune times; (iii) damaging the product; (iv) reserving shelf space for other products. Notably, Buck Bomb does not tie this amended defense into the broader "distribution agreement." (R.37, Response Br. at 10 ("In its Second Affirmative Defense, Buck Bomb does not contend that Plaintiff had any contractual obligations regarding the alleged conduct")).

Under contract principles, "[t]he promisor who breaks his promise is liable only for the harm that he causes, which is to say the harm that would have been avoided had he not broken his promise." *Outboard Marine Corp. v. Babcock Indus., Inc.*, 106 F.3d 182, 185 (7th Cir. 1997). Here, absent reference to the broader agreement, the "broken promise" relevant to Affirmative Defense No. 2 is Buck Bomb's failure to remit payment of $88,932.66 pursuant to the Buy-Back Agreement. (R.2-1, Compl. ¶¶ 20, 23). Had Buck Bomb "not broken [this] promise"—that is, had Buck Bomb remitted the $88,932.66 payment—all of Maurice's alleged harm "would have been avoided." *See id.* In its amended defense, Buck Bomb fails to explain *what* would constitute the remaining harm to Maurice that "occurred solely as a result of [Maurice's] acts." *Id.* In *Outboard Marine*, for example, the Seventh Circuit observed:

> Because of Outboard Marine's own design defects, some of its new engines would have failed (or so the jury could reasonably have found) even if the cables had been manufactured to the contractual specifications, which is to say that some of the harm that Outboard Marine suffered as a result of the engine failures would have occurred even if there had been no breach of warranty. That harm would have to be subtracted from the $12.38 million or $19.13 million in order to determine Outboard Marine's recoverable damages.

*Id.* Here, by contrast, Buck Bomb has failed to allege, or explain, how "some of the harm that [Maurice] suffered . . . would have occurred even if there had been no breach[.]" *Id.* As Maurice observes, "the whole premise of the Buy-Back Agreement was that Buck Bomb *agreed* to buy back the invoiced Buck Bomb products that Maurice had in its possession, however much

11

or little that might be." (R.34, Opening Br. at 11). Because Buck Bomb has failed to allege factual support consistent with a contribution defense in this case, the Court strikes Affirmative Defense No. 2 with prejudice.

## III. Affirmative Defense Nos. 3 and 4 (Unclean Hands and Equitable Estoppel)

Affirmative Defense No. 3 states that "Plaintiff's claim to equitable relief in the form of unjust enrichment is barred by the doctrine of unclean hands as Plaintiff fraudulently induced Buck Bomb to continue in the longstanding distribution agreement, which necessitated the Buy-Back Agreement." (R.32, Affirmative Defense No. 3). Affirmative Defense No. 4 states that Plaintiff "is equitably estopped from enforcing the contract alleged in its Complaint," referencing the factual specifics of Affirmative Defense No. 3. (*Id.* at Affirmative Defense No. 4). The Court previously struck both defenses for failure to include any facts establishing their essential elements. (R.31, Order at 10-12). As the underlying theory for both defenses, Buck Bomb now alleges that, on three occasions in April 2014, three Maurice representatives made "fraudulent" statements to Buck Bomb's then-president in order to induce Buck Bomb to continue in the distribution agreement for another year. In particular, the Maurice representatives stated that they "would distribute the [p]roduct the way they always had," when, in reality, they had "no intention" of using "best efforts" to distribute the products or to meet sales forecasts. (R.32, Affirmative Defense No. 3, ¶¶ a-g, No. 4, ¶ a).

The parties do not dispute that this alleged misconduct sounds in promissory fraud. "Promissory fraud is a false representation of intent concerning future conduct, such as a promise to perform a contract when there is no actual intent to do so. As a general rule, promissory fraud is not actionable in Illinois unless the promise is part of a 'scheme' to defraud." *Houben v. Telular Corp.*, 231 F.3d 1066, 1074 (7th Cir. 2000) (citation omitted); *see also Bower v. Jones*,

978 F.2d 1004, 1011-12 (7th Cir. 1992) (noting that promissory fraud "is a disfavored cause of action in Illinois" but discussing the "scheme" exception). "Fraud claims based on state law," moreover, "are subject to the heightened pleading standard of Rule 9(b) when brought in federal court." *Putzier v. Ace Hardware Corp.*, 50 F. Supp. 3d 964, 972 (N.D. Ill. 2014).

Here, Buck Bomb relies on the "scheme" exception to support its unclean hands and equitable estoppel defenses. (R.37, Response Br. at 10-11). In particular, Buck Bomb alleges that these false promises of future conduct were "part of a larger scheme to defraud Buck Bomb, destroy demand and market share for the [p]roducts, and to create market share" for another product. (R.32, Affirmative Defense No. 3, ¶¶ h-i). Buck Bomb does not, however, specifically link these "best-efforts" representations to the alleged "scheme to defraud," nor does Buck Bomb allege its detrimental reliance on such promises. *See Houben*, 231 F.3d at 1074; *Bower*, 978 F.2d at 1011-12. Even construing these 2014 promises as "part of a larger scheme," moreover, Buck Bomb fails to relate this "fraudulent scheme" to the Buy-Back Agreement at issue here – that is, to the *transaction complained of* and to which the unclean hands defense applies. *See Energetec Sys., Inc. v. Kayser*, No. 84 C 10611, 1986 WL 8058, at *2 (N.D. Ill. July 17, 1986) ("The defense of unclean hands is shown by misconduct by the plaintiff involving the transaction complained of, which amounts to fraud, misconduct or bad faith toward the defendant making the contention"). In *Energetec*, for example, the court observed:

> In support of this defense, Kayser points to Energetec's alleged failure to satisfy all its obligations under their agreements. This argument fails because the transaction in issue is Kayser's appropriation of the specification sheets. Kayser construes the transaction more broadly to include all his dealings with Energrtec. This is error.

*Id.* at *2. Similarly here, Buck Bomb has not alleged facts amounting to fraud or bad-faith by Maurice with respect to the 2015 Buy-Back Agreement. Buck Bomb's suggestion of promissory fraud in the course of general business dealings throughout 2006-2014 does not entitle it to claim

13

unclean hands as an affirmative defense to Maurice's specific equitable claim.[5] *See PNC Bank v. Chicago Title Land Trust Co.*, No. 14-CV-7543, 2015 WL 5445056, at *3 (N.D. Ill. Sept. 15, 2015) (striking unclean hands defense, in part, for failure "to allege a plausible basis as to why Plaintiff's alleged contractual breaches would impact this foreclosure action . . . In other words, as fashioned, Defendants' affirmative defense looks more like a counterclaim and less like an affirmative defense"). In this case, Maurice alleges that it is "unjust for Buck Bomb to retain the returned Buck Bomb product for which Maurice has already paid without compensating Maurice." (R.2-1, Compl. ¶ 42). That unjust enrichment claim is not "sufficiently related" to whether Maurice, "at some earlier point," falsely promised to use "best efforts" to satisfy sales forecasts, such that Maurice is "barred from court on [its] claim." *See Sullens v. Graham*, No. 14 CV 866, 2014 WL 6765138, at *2 (N.D. Ill. Dec. 1, 2014) ("The doctrine of unclean hands should not be used to defeat a suit simply because the plaintiff is guilty of some other, unrelated misconduct"). Accordingly, the Court strikes Affirmative Defense No. 3.

Buck Bomb's failure to allege misconduct with respect to the Buy-Back Agreement is also fatal to its equitable estoppel defense. Buck Bomb contends that Maurice "is equitably estopped from enforcing the contract alleged in its Complaint" – that is, the Buy-Back Agreement. (R.32, Affirmative Defense No. 4). Here again, however, Buck Bomb alleges no misrepresentations or material omissions related to the Buy-Back Agreement. *See Household Fin. Servs., Inc. v. Ne. Mortgage Inv. Corp.*, No. 00 C 0667, 2000 WL 816795, at *2-3 (N.D. Ill. June 22, 2000). While Buck Bomb suggests that it may have terminated their business relationship in 2014—prior to entering the Buy-Back Agreement—had it known of Maurice's intentional failure to use "best efforts," (*see* R.32, Affirmative Defense No. 4, ¶ b), such

---

[5] As the Court previously recognized, the unclean hands defense is applicable only to Count III – unjust enrichment. (R.31, Order at 11 n.5).

speculation alone cannot constitute "prejudice" under an equitable estoppel theory.[6] Because Buck Bomb has again failed to set forth a plausible statement of the material elements of the equitable estoppel defense, *see Davis*, 592 F. Supp. 2d at 1058, the Court strikes this defense with prejudice.

For these reasons, the Court strikes, with prejudice, Affirmative Defense Nos. 3 and 4.

## CONCLUSION

For the stated reasons, the Court grants in part and denies in part Maurice's renewed motion to strike and dismiss. (R.33). The Court denies Maurice's motion to strike the First Affirmative Defense. The Court grants Maurice's motion as to the remaining challenged defenses and dismisses the Second, Third, and Fourth Affirmative Defenses with prejudice.

**Dated:** August 23, 2016
ENTERED

_____
AMY J. ST. EVE
United States District Court Judge

---

[6] The Court also fails to see how Buck Bomb had no "means of knowing the true facts" with respect to Maurice's "best efforts" representations prior to 2015, when—according to complaint allegations—Buck Bomb was in direct contact with retailers. *See R & B Kapital Dev., LLC v. N. Shore Cmty. Bank & Trust Co.*, 358 Ill. App. 3d 912, 922, 832 N.E.2d 246, 256 (1st Dist. 2005) ("a party claiming the benefit of an estoppel cannot shut his eyes to obvious facts, or neglect to seek information that is easily accessible, and then charge his ignorance to others") (citations and quotations omitted).

15